TROY V. POST AND EMMA L. POST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Post v. Commissioner
Docket Nos. 7404-74, 2333-77.
United States Tax Court
T.C. Memo 1979-419; 1979 Tax Ct. Memo LEXIS 104; 39 T.C.M. (CCH) 311; T.C.M. (RIA) 79419; October 4, 1979, Filed; As Amended November 26, 1979 W. John Glancy,H. Robert Powell,G. Russell Mortenson, for the petitioners. Raymond L. Collins, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases the respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No.
Year Deficiency
7404-74
1969 $ 440,055.00
7404-74
1970
7,102.53
7404-74
1971
5,793,316.21
2333-77
1972
534,686.28
Concessions having been made, [1] the following issues remain for our decision: *107 (1) Whether the investment of petitioner Troy Post in the stock of Tropo, S.A. de C.V. (Tropo) in the amount of $12,959,117.36 was worthless on December 31, 1970. (2) Whether petitioners are entitled to deduct in 1971 advances totaling $5,623,128.68 made to Tropo and Tres Vidas en la Playa, S.A. de C.V. (Tres Vidas) as ordinary and necessary business expenses, business bad debts or nonbusiness bad debts. (3) Whether petitioners are entitled to deduct in 1972 advances totaling $4,535,852.69 to Tropo and Tres Vidas as ordinary and necessary business expenses, business bad debts or nonbusiness bad debts. (4) Whether, for purposes of net operating loss carry-backs for the years in issue, petitioners are entitled to deduct in 1973 and 1974 advances totaling $2,939,145.27 and $715,939.45, respectively, to Tropo and Tres Vidas as ordinary and necessary business expenses, business bad debts or nonbusiness bad debts. (5) Whether interest payments made by petitioner Troy Post in 1971 in the amount of $753,071.93 on debt obligations of Tropo and Tres Vidas are deductible on petitioners' 1971 Federal income tax return. (6) Whether a payment in the amount of $1,000,000 to Investors *108 Overseas Services, Ltd. in connection with the settlement of litigation may be deducted in 1972 as interest paid or as a worthless bad debt. (7) Whether consultant fees of $61,000 and $100,000 paid by petitioner Troy Post in 1969 and 1972 to Club Corporation of America are deductible as ordinary and necessary business expenses. (8) Whether interest paid by Tres Vidas to Club Corporation of America in 1972 and 1974 was properly deductible by petitioners. (9) Whether certain legal and other fees totaling $279,579.02 paid by petitioner Troy Post during 1972 are deductible by petitioners as an ordinary and necessary business expenses. (10) Whether worthless loans totaling $420,000 made by petitioner Troy Post in 1968 to Preston Towers, Ltd. are deductible as a business or nonbusiness bad debts in 1969. (11) Whether petitioner Troy Post realized long-term capital gain in the amount of $247,390.64 rather than ordinary income on the 1972 sale of his equity in certain mortgage notes to The Company, Ltd. (12) Whether petitioners are entitled to deduct $122,790.84 in 1972 as a guarantor loss. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. *109 Petitioners Troy V. Post (hereinafter petitioner) and Emma L. Post, husband and wife, were residents of Dallas, Texas, when their petitions were filed in these consolidated cases. Their joint Federal income tax returns, and some amended returns, [2] for the calendar years 1969 through 1975 were filed with the Internal Revenue Service Center in Austin, Texas. Facts Relating To Issues 1 Through 4
In 1965, petitioner, as Chairman of the Board of Directors of Braniff Airways (Braniff), visited Mexico and acquired permission from the Mexican government to allow Braniff to fly to Acapulco, Mexico. Following procurement of flight routes for Braniff, petitioner entered into a joint venture with former President Aleman of Mexico to build the first new hotel in Acapulco since the nineteen fifties. Upon completion of the hotel, petitioner embarked upon an ambitious plan to build in Acapulco the finest private country club in the world. Petitioner initially envisioned a fashionable country *110 club fronting on the Pacific Ocean, built from the finest and most costly materials and filled with only the "elite" of the world. Quality would be stressed over cost and an environment would be created that would encourage communication, relaxation, and recreation among the elite that petitioner described as the Fortune 500 executives. Petitioner, who had reached his peak in the business world, would in effect be the host at this exclusive club. To carry out his plan, petitioner purchased in 1966 or 1967 approximately 750 acres of land located 18 miles south of Acapulco at a cost of $2,000,000. The property had a beachfront extending five miles along the coast of the Pacific Ocena. The Acapulco International Airport was located in close proximity to the property and a modern highway connected the property to downtown Acapulco, which by car or taxi was a thirty minute ride. At that time certain provisions in the Constitution of Mexico prohibited direct ownership by non-Mexican citizens of real property that lay adjacent to the coast of Mexico. In an effort to accommodate petitioner the Mexican government indicated that a foreigner could legally avoid this prohibition by holding *111 shares of a Mexican corporation which in turn would hold shares in a Mexican subsidiary which would hold actual title to the land located in the prohibited zone. Petitioner obtained a legal opinion from a prominent Mexican law firm that this two tier corporate arrangement was proper. To effect his ownership of the property, in March 1966, petitioner organized Tropo, a Mexican limited liability stock company. In 1967 Tropo acquired all of the outstanding stock of Inmobiliaria Tropo S.A. de C.V. [Inmobiliaria Tropo] and Inmobiliaria Helix S.A. de C.V. [Inmobiliaria Helix], limited liability stock corporations organized under the laws of Mexico. Inmobiliaria Tropo held title to approximately 577 acres of land on which petitioner planned to build his club, which was to be named Club-Tres Vidas. Inmobiliaria Helix held title to the adjacent 117 acres. In 1968, a third Tropo subsidiary corporation, Tres Vidas, was organized. This subsidiary was to hold title to the Club-Tres Vidas and its recreational facilities. In 1968, petitioner sold his 3,173,000 shares of Great America Corporation to Ling-Temco-Vought, Inc. (LTV). In exchange, petitioner received LTV debentures with *112 a face amount of $95,190,000 (due in 1988 and paying 5 percent interest) and stock warrants valued at $13,326,600. Upon receipt of the debentures, petitioner sold approximately 10 percent in the open market and received approximately 60 percent of their face value. In January 1968, petitioner obtained the services of Club Corporation of America (CCA) to build the country club. When CCA was retained, petitioner envisioned a resort consisting primarily of a large and elaborate clubhouse, two surrounding golf courses, tennis courts, and limited facilities for overnight guests. However, after one year of construction and acting on the advice of his advisor Bruce Leadbetter (Leadbetter), petitioner substantially expanded the scope of the resort complex. The original number of 68 rooms was increased to 300. Petitioner had expanded Club-Tres Vidas from a private country club with limited overnight facilities into a resort complex accommodating overnight guests. The dramatic expansion of the original plans greatly increased the building costs.
To carry out the expanded plan, petitioner dismissed CCA and retained the services of one of the largest construction companies in the world, *113 the Henry C. Beck Company (Beck). Petitioner informed Beck that the project had to be completed prior to Christmas 1969, so the resort could open for the 1969-70 winter tourist season. In an effort to meet the 11 month deadline, cost overruns and chaos were the norm rather than the exception. Petitioner insisted, however, that the planned high level of quality construction be maintained. Petitioner recognized that the Club would not be economically viable unless the surrounding properties owned by Tropo's subsidiaries were developed. Such development, in the form of hotels and condominiums would provide the Club with sufficient traffic to limit or reverse the anticipated operating losses. Moreover, petitioner hoped that the Club would act as a catalyst for land value appreciation in the properties held by Tropo's subsidiaries for sale for subsequent condominium and hotel development. With a view to the large scale development of Tropo real properties, petitioner recognized that third party financing would be both necessary and desirable. Moreover, petitioner did not wish to continue to completely finance the Club personally. Thus, in January 1969, Leadbetter, acting on *114 behalf of petitioner and Tropo and its subsidiaries, contacted Investors Overseas Services (IOS) as a likely financier. At the commencement of negotiations IOS was one of the world's largest mutual fund companies. The negotiations with IOS concluded with an agreement in late 1969 that petitioner and IOS would engage in a joint venture to build hotels, condominiums, and a Mexican village (shopping, restaurants, and discos) adjacent to the Club-Tres Vidas on properties owned by Tropo's subsidiaries. In addition, $15,000,000 would be made available for the expansion, operation, and refinancing of Club-Tres Vidas. To finance the planned projects IOS agreed to market an $18,750,000 bond issue which would be debt obligations of Tropo secured by the Club-Tres Vidas. Additionally IOS would sell $20,000,000 worth of the common stock of a new corporation that would be formed by the joint venture to build and operate the hotels, condominiums, and Mexican village. From the bond issue Tres Vidas was to receive $15,000,000 and IOS the balance for its efforts. The hotels, Mexican village, and condominiums were to be built from the $20,000,000 received from the sale of stock. Contemporaneous *115 with the negotiations, IOS in late 1969 loaned Tropo $5,000,000. The loan, which was made on October 30, 1969, was evidenced by a short-term promissory note issued by Tropo and was secured by petitioner's Tropo stock. In addition, petitioner was required to personally guarantee payment. The stated purpose of the loan was to complete construction at Club-Tres Vidas. However, contrary to the stated purpose, petitioner withdrew the $5,000,000 from Tropo thereby reducing his investment. In May 1969, petitioner had similarly reduced his investment in Tropo by an additional $6,500,000. As of October 31, 1969, petitioner's investment in Tropo and Tres Vidas, including advances as well as contributions to capital, totaled only $2,803,981.11. Club-Tres Vidas opened for business in December 1969. At that time, petitioner had sold 225 memberships in the Club at a price of $5,000 each. Most of the major construction at the Club had been completed except for 104 rooms. In March 1970, petitioner was notified by IOS that it would proceed with the earlier financing commitment. IOS's failure to proceed was based on internal financial difficulties. On March 24, 1970, Tropo borrowed *116 $5,000,000 from Financiera Bancomer S.A. (Financiera Bancomer), a Mexican financial institution, to pay off certain trade creditors and to finance the remaining construction. To secure the loan a senior mortgage in favor of Financiera Bancomer was placed on all the property owned by Tres Vidas, Inmobiliaria Tropo, and Inmobiliaria Helix. The mortgage agreement provided that the land could not be sold by the subsidiaries unless prior approval was obtained from Financiera Bancomer. With the collapse of the IOS deal, petitioner decided that the best plan of action would be to refinance the IOS and Financiera Bancomer loans, complete construction of the remaining 104 rooms using the money borrowed from Financiera Bancomer, seek new sources of financing for the hotel and condominium projects adjacent to the Club, and keep Club-Tres Vidas open by the advancement of personal funds to cover operating deficits. When petitioner approached Financiera Bancomer he encountered little resistance in extending the Tropo loan maturity dates. Financiera Bancomer did insist, however, that the final 104 rooms be completed. But, IOS was reluctant to extend its loan, and on June 26, 1970, petitioner, *117 Tropo, and certain other corporations of petitioner instituted a law suit [3] in the District Court for the Southern District of New York against IOS for damages for its alleged breach of the financing agreement. In addition, petitioner sought to enjoin: during the pendency of [the] action, defendants… [from] foreclosing, or attempting to foreclose, upon the shares of Tropo stock [then] in the custody or control… of… defendants, from transferring or in any way exercising dominion over said shares, from taking any step whatever to alter or affect the ownership… or from seeking to compel payment under said note or under guarantee of [petitioner]. A temporary restraining order against IOS was granted in July 1970.
In late 1970 petitioner approached Braniff Airways as a potential successor to IOS. Braniff Airways initially viewed the proposal with reservations; however, it considered it important enough to commission a feasibility *118 study by the consulting firm of Harris, Kerr, Forster & Company. In addition, an elaborate "Hotel Marketing Plan" was prepared by Hotels Braniff International S.A. de D.V. (Braniff Hotels). Braniff Airways approached its lenders to see if the necessary capital would be made available. The lenders refused and the proposal was never put before the Braniff Airways Board of Directors. Although Braniff Airways did not invest in the resort project, Braniff Hotels entered into an agreement with Tropo whereby Braniff Hotels would, for an annual fee of $80,000, take over the management of Club-Tres Vidas.Braniff Hotels received payment under the agreement until it was terminated in April 1973. On December 31, 1970, the Club-Tres Vidas was open for business. During the year 175 memberships, costing between $6,000 and $8,000, had been sold. Construction of the remaining 104 units was proceeding and no plans were made, notwithstanding its operating deficits during the year, to close down the operation of the Club. The consolidated loss statement for Tropo and its subsidiaries (including Tres Vidas) for 1969 and 1970 was as follows: CONSOLIDATED LOSS STATEMENT Tropo and Subsidiaries
*119 December 31, 1969 and 1970 1969
1970
REVENUE: Rooms
$ 29,465 $ 438,837
Food and Beverage
33,232
376,925
Other operated departments
10,689
254,800
Annual dues
181,860
Interest
36,562
Total
73,386
1,288,984
COSTS AND EXPENSES: Departmental costs and expenses: Food and beverage
57,114
584,239
Other
46,753
771,811
Administrative and general
287,701
1,343,304
Maintenance and repairs
152,279
804,718
Real estate tax
2,689
42,592
Light and power
19,475
233,701
Interest
354,819
1,199,556
Depreciation
47,352
692,336
Total
968,182
5,672,257
NET LOSS
894,796
4,383,273
DEFICIT AT BEGINNING OF PERIOD
49,804
944,600
DEFICIT AT END OF PERIOD
$944,600
$5,327,873
On December 31, 1970, Tropo and its subsidiaries had liabilities in the following amounts: Amount
Creditor
$5,000,000
Financiera Bancomer
5,000,000
IOS
1,000,000
Trade Creditors Liabilities of Tropo to First National Bank of Dallas (FNB) for funds borrowed during 1969 and 1970 were assumed by petitioner and repaid during 1970 and constitute capital contributions to Tropo and its subsidiaries. By December 31, 1970, petitioner had *120 increased his capital contributions to $12,959,117.36 from $2,803,981.11 as of October 31, 1969. In June 1971, petitioner's difficulties with IOS escalated. IOS filed a suit in the District Court for the Northern District of Texas demanding that petitioner, as guarantor, pay the $5,000,000 owed to IOS by Tropo. Contemporaneous with the institution of the IOS suit, petitioner sold $51,447,500 of LTV debentures for 45 percent of their face value. On December 31, 1971, Club-Tres Vidas was open and operating, albeit at a substantial deficit. This deficit was covered by petitioner's advances to Tropo of $2,700,000 and Tres Vidas of $2,923,128.68. During the year additional memberships in the Club were sold. On December 8, 1971, petitioner wrote a letter to his attorney in which he discussed a possible sale of an one-half interest in Tropo and the ultimate long-term financing program. The consolidated loss statement for Tropo and its subsidiaries for 1971 was as follows: CONSOLIDATED LOSS STATEMENT TROPO AND SUBSIDIARIES December 31, 1971 Revenue
Rooms $ 497,700
Food and Beverage
386,229
Annual Dues
182,097
Other Operated Departments
241,109
TOTAL
$1,307,135
Cost and Expenses
Departmental Costs and Expenses: Food and Beverage
447,149
Other
667,156
Administrative and General
762,132
Maintenance and Repairs
673,477
Real Estate
67,888
Light and Power
221,212
Interest
784,014
Depreciation
741,262
TOTAL
4,364,290
Net Loss
$3,057,155
*121 In 1972, Club-Tres Vidas continued to operate. Tropo purchased an additional 61 acres to provide club members with access to an inland fresh water lake. Construction was also started on a canal to connect the lake with the ocean. In addition, the 104 rooms were completed and put into service, a golf tournament was conducted successfully at the Club and new members were solicited. In April 1972, petitioner's immediate difficulties with IOS came to an end. In settlement of their dispute, petitioner agreed to transfer to an IOS subsidiary a 63 acre parcel of land adjacent to Club-Tres Vidas in return for IOS's assignment of Tropo's note to petitioner. In addition, petitioner agreed that IOS could require at its option that petitioner repurchase the parcel in mid-1975 for $5,964,000. The agreement to repurchase was evidenced by a promissory note for that amount given by petitioner to IOS. In conjunction with the settlement, petitioner agreed to immediately pay $1,000,000 to IOS. Finally, the Tropo stock, previously held by IOS as security for the Tropo loan was placed in escrow as collateral for the $5,964,000 promissory note. On December 27, 1972, petitioner filed with *122 the Securities and Exchange Commission a registration statement in which it was contemplated that an offering by Tropo and Tres Vidas would be made of interests in 80 two-bedroom apartments, 60 one-bedroom apartments and 2,577 memberships in the Club. Such an offering, petitioner believed, would provide the Club with the necessary business to cut operating losses and provide a substantial financial return on the real property owned by the Tropo subsidiaries. The registration statement provided the following picture of the Club-Tres Vidas operations up to that point in time: The business of the Club, like the economy of Acapulco generally, is highly seasonal. The tourist season in this resort city corresponds to the winter season and extends from approximately December 15 to March 31. The following table sets forth the occupancy rates of the Club facilities during the first two fiscal years of its operation, and also sets forth the occupancy rate for the winter season months and the off-season months during those periods: 1970
1971
Total Period
24%
20%
During Winter Season
48%
35%
During Off-Season
15%
12%
The average occupancy rate during the nine-month *123 period ended September 30, 1972 was 28%, compared with 20% during the same period in 1971. The average occupancy rate during the on-season months of that period was 50%, compared with 32% during those months in 1971. The average occupancy rate during the off-season months during that period was 12%, compared with 12% during those months in 1971. These occupancy rates are based upon the 33 villas and 80 club suite rooms which were available for occupancy during the periods covered and do not give effect to the completion in November, 1972, of an additional 104 club suite rooms…. At the present time, Tres Vidas rents its villas to Club members at $120 to $240 a day, and rooms in its club suites at the rate of $45 a day for a single room, or $90 a day for a two-room suite. During the winter season, the Club charges an additional $15.00 per day to guests of Club members for both the villas and club suite rooms. However, the occupancy rates set forth above reflect in part rentals at special, reduced rates which have been made available by the Club. During both the winter and off-season, the Club has made its facilities available to groups sponsored by members, including corporate *124 members, at such special, reduced rates. In addition, from time to time, Tres Vidas has accommodated hotels in Acapulco and its environs by making available rooms to persons or groups of persons with reservations at such hotels when such hotels were over-booked, although this practice has now been terminated. On occasion the rentals charged by Tres Vidas to such persons or groups were substantially less than the Club's usual rental rates. The primary reason for the decline in occupancy rates in 1971 as compared to those in 1970 was the Club's active solicitation during 1970 of groups to visit the Club on a "get-acquainted basis" with the hope that members of the groups would become members of the Club. This experiment, while increasing the occupancy rates of the Club facilities, proved unprofitable to the Club and was continued subsequently only on a more selective basis. The Company also believes that the decline in occupancy rates in 1971 may have been attributable in part to the general decline in tourism in Mexico from the United States. The Company believes that the increase in occupancy rates for the nine-month period ended September 30, 1972, as compared with the same *125 period in 1971, was attributable in part to newspaper and magazine publicity concerning the Club, as well as to improved economic conditions in the United States. The increased revenues due to such increased occupancy rates during that period of 1972, however, were more than offset by substantially higher operating expenses. These increased expenses were attributable to the hiring and training of a substantial number of additional employees at the Club and the incurring of other expenses incident to the opening in November, 1972 of an additional 104 club suite rooms; the incurring of substantial deferred maintenance expenses in preparation for the Bing Crosby Pro-Amateur International Fiesta Golf Tournament in November, 1972… Each member of the Club pays annual dues of $480. However, Tres Vidas' revenues are substantially dependent upon the use of its facilities, as indicated by the following table: Contributions to Tres Vidas' Revenues Nine Months
Nine Months
Ended
Ended
September 30,
September 30,
1970
1971
1971
1972
Membership dues
14%
14%
15%
10%
Rentals
34%
38%
39%
41%
Food and beverages
29%
30%
28%
30%
Recreation fees and other sources
23%
18%
18%
19%
100%
100%
100%
100%
*126 The nature of the business of Tres Vidas requires that high fixed costs be incurred throughout the year. Such costs include wages and salaries, the cost of maintenance and upkeep of the Club facilities, and interest expense and depreciation. Because of these high fixed costs and the low occupancy rate of the Club facilities, the operations of those facilities have resulted in substantial losses to Tres Vidas since their opening…. In addition, Tres Vidas has not generated sufficient cash to maintain the operation of the Club facilities without incurring substantial debt, even after giving effect to substantial contributions to the capital of the Company by Mr. Troy V. Post…. Management believes that the primary reason for the low occupancy rate of the Club facilities has been the small number of members eligible to use its facilities. As indicated above, this factor has been offset to some extent by permitting the use of the facilities by non-member groups as guests. In addition, during 1972, Braniff Airways, Incorporated has permitted bookings at the Club through its sales offices on a guest card basis. In order to place the operations of the Company on a sounder financial *127 basis, however, Tres Vidas has decided to seek to expand the membership of the Club through this offering… The ability of Tres Vidas to reduce its operating losses or to operate the Club facilities profitably will depend in large measure upon the success of this offering. Mr. Post has entered into an agreement with Tropo to continue to make loans to the Company to cover any cash deficits incurred in its operations (or arrange for debt or other financing to cover such deficits) when, as, and if required for at least two years from the date of this Prospectus. In determining the extent of any such cash deficits, cash provided to the Company from this offering, from the sale of lots… and from the sale of other securities or assets sold in the ordinary course of business would be taken into account. Mr. Post's agreement relates solely to the cash deficits, if any, noted above and does not oblige him to pay or guarantee to pay any part of the principal of the Company's present or future indebtedness or oblige Mr. Post or the Company to continue the Company's present mode of operations. That agreement provides that, in the event of Mr. Post's death during its term, it shall be binding *128 upon his estate and upon his heirs. The registration statement also provided, in part, that: Tres Vidas intends ultimately to develop much of the remaining undeveloped area of its property. Current plans include the construction of the three apartment buildings to which this offering relates. In addition, concurrently with this offering, Tres Vidas is offering for sale to members of the Club 86 undeveloped lots on the Club grounds on which members would construct private homes…. Those lots, each of which faces either one of the golf courses or the beach and includes between 5,600 and 10,000 square feet, comprise an aggregate area of approximately 11 acres. They are being offered to members of the Club, including new members, for prices ranging from $35,000 to $120,000, depending upon size and location…. The registration statement contained the following consolidated balance sheet of Tropo and its subsidiaries, as of August 31, and September 30, 1972: Tropo and Subsidiaries Balance Sheet
August 31,
September 30,
1972
1972
(Audited)
(Unaudited)
CURRENT ASSETS: Cash $ 232,249 $ 170,843
Accounts receivable--Trade (less
allowance
for doubtful accounts at August 31 and
September 30, $44,000)
241,906
255,717
Inventories
119,810
136,110
Prepaid expenses
52,764
46,672
Total current assets
646,729
609,342
OTHER ASSETS: Accounts receivable--Affiliated
companies
104,924
106,830
Advances and deposits
261,932
263,012
Memberships receivable due after
one year
100,000
232,000
Total other assets
466,856
601,842
PROPERTY AND EQUIPMENT
Land
137,956
137,956
Buildings
13,937,697
13,941,047
Golf course installations
2,783,212
2,783,212
Furniture and equipment
2,567,498
2,571,362
Construction in progress
2,113,387
2,420,263
Total
21,539,750
21,853,840
Less accumulated depreciation
1,942,475
2,004,792
Property and equipment--net
19,597,275
19,849,048
Total
$20,710,860
$21,060,232
CURRENT LIABILITIES: Accounts payable: Trade $ 460,104 $ 535,458
Affiliated company--Empresa
Continental
Mexicana, S.A.
323,240
323,240
Accrued expenses: Taxes, other than
income tax
146,013
117,953
Interest
239,167
296,581
Other
81,142
75,160
Total current liabilities
1,249,666
1,348,392
LONG-TERM DEBT
Financiera Bancomer, S.A.
5,000,000
5,000,000
Troy V. Post--noninterest-bearing,
payable
in U.S. dollars upon demand
10,594,169
11,046,112
Total long-term debt
15,594,169
16,046,112
MEMBERSHIP DEPOSITS
2,306,000
2,482,000
SHAREHOLDERS' EQUITY
Authorized common stock,
par value: Minimum capital--5,000
Series "A"
shares, issued and outstanding
12,000,000
12,000,000
Variable capital--Unlimited
Series "B"
shares; none issued
Deficit
10,438,975
10,816,272
Shareholders' equity--net
1,561,025
1,183,728
Total
$20,710,860
$21,060,232
*129 The accompanying notes to the consolidated balance statement indicate that: .. .
6. Long Term Debt The bank loan (originally made on a short-term basis and renegotiated to a long-term basis in 1971) by Financiera Bancomer… was renegotiated on November 16, 1972 and now is payable in three installments of… $1,666,667 each, due on March 24, 1974, 1975, and 1976….
As to the non-interest bearing obligation payable on demand to Troy V. Post, it is not his intention to require payment currently. . . .
8. Deficit In accordance with Mexican Law, if the accumulated losses (deficit) of a company exceeds two-thirds of its capital stock, it may be dissolved upon request from any shareholder or creditor of the company; in the opinion of Mexican legal counsel for the companies, the companies do not have a deficit for this purpose because of the excess of the appraised value of the properties over the book value thereof. The registration statement was withdrawn on January 11, 1974 and was declared abandoned by the SEC on March 22, 1974. Contemporaneous with the filing of the registration statement, petitioner entered into negotiations with William Maurer (Maurer), *130 president of Diamond Head Corporation (Diamond Head) as a potential source of financing for the Club and development of real properties owned by the Tropo subsidiaries. The initial proposal of Diamond Head provided that it would take charge of 100 percent of Tropo and its subsidiaries' operations and enter into a five-year option to purchase 50 percent of Tropo stock from petitioner based on an estimated value of $25,000,000. Subsequently, Diamond Head proposed that it immediately acquire 50 percent of petitioner's Tropo stock and one-half of petitioner's non-interest bearing notes in consideration of petitioner receiving 670,000 shares of Diamond Head. In addition, Diamond Head would seek or establish a $15,000,000 line of credit to liquidate current and long term obligations and provide the necessary monies for the contemplated expansion and sales program. Finally, management of the operation of the Club and sales would be controlled by Diamond Head. On July 19, 1973, Diamond Had proposed that Tropo be purchased for $15,000,000 plus assumption of all existing debts, including petitioner's non-interest bearing notes. Payment of the $15,000,000 would be 50 percent in Diamond *131 Head stock and 50 percent in long term notes payable from earnings realized in the contemplated sales program. On July 23, 1973, petitioner made a counter proposal in which he proposed to exchange 100 percent of his Tropo stock for 750,000 shares of Diamond Head and the assumption of $9,750,000 of Tropo's and Tres Vidas' non-interest bearing subordinated note, payable within three years of the date of the exchange. Subsequently, the original concept of petitioner's exchange of his Tropo stock for Diamond Head stock was dropped. As an alternative, Diamond Head proposed a management contract arrangement which was not acceptable or desired by petitioner. Accordingly, in September 1973, negotiations with Diamond Head ceased. During the course of the negotiations with Diamond Head, petitioner informed Maurer that the property was in beautiful condition, that petitioner could generate $15 to $20 million quick cash for the sale and leaseback of the then existing 300 rooms and that Club's potential was three times as great as a nearby resort hotel. The red herring prospectus that was attached to the registration statement filed December 27, 1972, was also made available to Maurer. *132 During the period in which petitioner engaged in negotiations with Diamond Head, the Club was open for business and maintained an occupancy rate at least as high as preceding years. Construction of the canal to provide marine access from the ocean to the lake was completed and a Bing Crosby golf tournament was held in September 1973. Operating deficits in 1973 were 25 percent less than the previous year. In 1973, petitioner made advances to Tropo and Tres Vidas in the amount of $2,939,145.27. Subsequent to the Diamond Head negotiations, Leadbetter in March 1974 negotiated with Loeb-Rhoades, a New York financial institution, to obtain a $2,800,000 loan to be used by Tres Vidas and Tropo for working capital and to refinance part of the still outstanding Financiera Bancomer obligation of Tropo. The loan was to be made to one of petitioner's domestic corporations which in turn would buy 1,667 acres of land owned by Immobiliaria Tropo S.A. for $2.5 million dollars. Contemporaneous with the negotiations for the loan, Leadbetter on March 26, 1974, informed Loeb-Rhoades that: [he had] received calls from… Braniff… and Diamond Head Corporation in connection with the possibility *133 of joint venturing a hotel or condominium project at Tres Vidas. With the turn-around in operations and the response that we're getting from members on the mixed club-hotel type use, it appears that the vultures who had been historically lying in the weeds have now come out and are ready to take on projects on a deal by deal basis rather than try to bite off the whole project. Shortly before the loan was completed, however, landless peasants known as "ejidos" invaded the Tres Vidas properties. This invasion created a certain level of inconvenience but did not result in closing the Club. Petitioner was informed by the Mexican government that help in removing the ejidos would not be forthcoming unless Tropo and Tres Vidas were "Mexicanized". Moreover, the Mexican government indicated that its necessary approval of the Loeb-Rhoades loan would not be granted unless Tres Vidas was "Mexicanized". Such "Mexicanization", petitioner believed, was likely to be found in a group of wealthy Mexican investors, known as the Mendosa group. Thereafter petitioner, Tropo, and the Mendosa group proposed to enter into a business arrangement called the "May Y Sol transaction". May y Sol was a Mexican *134 corporation formed prior to the commencement of negotiations. Eventually it became 50 percent owned by the Post Company (Nevada) or one of its subsidiaries and 50 percent by the Mendosa group. On November 15, 1974, the parties entered into an agreement in which Inmobiliaria Tropo and Tres Vidas would transfer in trust their real estate in exchange for $15,000,000 to be paid by Mar y Sol and Tropo would transfer the Club-Tres Vidas in trust for Mar y Sol in exchange for another $15,000,000. Contemporaneous with the agreement, it was desired that a refinancing of the Financiera Bancomer loan be effected. Under the agreement, May y Sol was to pay the $30,000,000 purchase price to Tropo in annual installments of $3,000,000. Tropo, in turn, would pay off the Financiera Bancomer loan from the annual $3,000,000 payments. Mar y Sol, in early 1975, engaged in negotiations with Canadian Pacific Hotels, Inc. (CP) with respect to a hotel management contract at the Club and held itself out as having the authority to enter into a management agreement with CP. On December 31, 1974, the Club-Tres Vidas was open and operating, memberships were being sold and renewal dues collected, and the *135 ejidos had been removed from the property. The net cash flow deficit as of November 30, 1974, was $745,000, compared to $2,799,340 at the same time a year earlier. Petitioner advanced only $714,939.45 in 1974 to Tropo and Tres Vidas. Efforts to "Mexicanize" Tres Vidas continued in 1975. In June 1975, the Club was invaded for a second time by the ejidos. This invasion, unlike the first, forced the Club to close. Shortly thereafter, petitioner wrote the Mexican membership the following letter: At this time I am writing only to you Mexican members in hopes a Mexican solution to Tres Vidas's problems can be considered without alarming foreign members, investors and press. Tres Vidas is partially occupied (for the second time) by an "ejido" invasion. The Court has issued an "empara", but the authorities and the "ejitarios" will not recognize the Court; so Tres Vidas is closed.
Tres Vidas was built as the finest country club in the world with about $2,500,000 of your membership fees, almost $30,000,000 of my personal funds, and about $7,500,000 now owed by Tres Vidas to Banco de Comercio. All land titles were thoroughly checked by our attorneys, Basham, Ringe y Correa, before *136 the property was purchased from and through reputable Mexicans over eight years ago. We have three different independent appraisals that indicate the improvements and property owned by Tres Vidas have a value ranging from $52,000,000 to $85,000,000. As many of you know, Tres Vidas planned to sell homes, villas and lots, as well as condominium and hotel sites, and many of you expressed an interest. As you all know, the ultimate value of the Tres Vidas complex is in the sale of properties and not just the revenues from the operations alone. Our property sales program was stopped, after several million dollars of tentative sales were committed, by the first "ejido" invasion last year, and since that time things have become increasingly worse. This past year our property taxes were increased 132%, an extraction tax of $122,000 per year was levied on us for the water we pump out of our own lakes, and administrative delays and other problems have been infinite. Assuming the problems may have arisen because the Club was American owned, we tried to "Mexicanize", we tried to joint-venture with Mexican companies, and we tried to sell portions to Mexicans. An offer to sell 51% of *137 the Tres Vidas complex for $1.00 and a $16,000,000 long-term loan to Tres Vidas to clear up obligations was made to Banco de Comercio and to Canadian Pacific Hotels, who now have a joint real estate venture in Mexico. The offer was also made recently to the Mexican Government through Mr. Julio Hirschfeld Almada, the Secretario de Turismo.
This same offer has now been made to a group of Mexicans sponsored by our Mexican attorneys, through Mr. Antonio Correa A., who says the proposition is likely to be decided upon this week. Although such arrangement would cause me to suffer a personal loss of more than $15,000,000, I am willing to do so for a number of reasons. The Club is now in a position where we cannot operate, we cannot sell, we cannot lease, and we cannot refinance for the reasons I have mentioned. Unless some reasonable solution can be developed, the Club has no future. … On September 9, 1975 petitioner informed a Mr. Luis Hernandez that he could not: express too strongly the need for resolving our problems immediately at Tres Vidas as we are being forced to cancel many reservations for the coming season because of the publicity of being closed. We need to *138 be open by October 1st as it will take at least one month to get ready after being closed the past four months. The Club has never reopened. Since 1975 petitioner has made numerous proposals and efforts to reopen the Club and continue the development as originally contemplated. Most of the plans consist of a contribution of part of petitioner's interest in Tropo to a Mexican trust entity so that "Mexicanization" of the Club and its properties might occur. To date, no definite plans have been made to reopen the Club.Tropo and Tres Vidas filed for bankruptcy in 1976. Financiera Bancomer, which still holds a first mortgage on all Tropo and Tres Vidas properties, has not foreclosed on the realty, pending negotiations between petitioner and the Mexican government. The following table indicates the advances made by petitioner to Tropo and Tres Vidas between 1971 and 1974: Total Advances to
Tropo and Tres Vidas
1971
$5,623,128.68
1972
4,535,852.69
1973
2,939,145.27
1974
714,939.45
These advances were evidenced by unsecured and non-interest bearing demand notes. They were made to meet operating and construction expenses and were parceled out *139 as needed. all of the advances were made by petitioner at a time when he was the only shareholder of the corporations. Facts Relating To Issue 5
In 1970, Tropo borrowed $5,000,000 from Financiera Bancomer. The note was secured by a senior mortgage on all the real properties of Tropo and its subsidiaries. In 1971, petitioner paid interest in the amount of $603,493.34 on the Financiera Bancomer loan. Petitioner was neither a guarantor nor a joint obligor of the note. Petitioner in 1971 also paid $145,245.27 in interest to the Schroder Trust Company and $4,333.32 in interest to First National Bank of Dallas. Such payments were for interest accrued on loans made to Tropo and Tres Vidas, respectively. Petitioners deducted such payments on their 1971 Federal income tax return as an ordinary deduction for interest expense. Facts Relating To Issue 6
The lawsuits between petitioner and the IOS interests were settled by agreement on April 11, 1972. Pursuant to such settlement, petitioner, through a Mexican corporation, transferred to IPI (a subsidiary of IOS) approximately 63 acres of vacant beachfront land situated between Club-Tres Vidas and Acapulco.Petitioner *140 also gave IPI an option under which IPI could require petitioner to repurchase the land for $5,984,000 during a time period beginning three years from the date of the execution of the option (June 28, 1972) and ending three years and six months from that date. Petitioner's obligation to repurchase the parcel was evidenced by a non-interest bearing promissory note to IPI executed by petitioner in the amount of the repurchase price. As part of the settlement, the original $5,000,000 Tropo note to IOS dated October 30, 1969, was transferred to petitioner. In addition, IOS released petitioner from his original guaranty on the Tropo note. Finally, the Tropo stock, originally held by IOS as collateral for the 1969 IOS loan to Tropo, was placed in escrow as security for petitioner's $5,984,000 repurchase obligation. The original $5,000,000 note given by Tropo in 1969 to IOS was to pay 13 1/2 percent interest per annum. No interest on the note was paid prior to the settlement in mid-1972. Contemporaneous with the settlement petitioner paid IOS $1,000,000. Facts Relating To Issue 7 And 8
On January 9, 1968, petitioner and CCA entered into a "Management and Consultation Agreement" *141 in which CCA became the general coordinator and overseer of development at Tres Vidas. During the period in which CCA managed construction of the Club-Tres Vidas, all agreements, purchase orders, or other obligations of any kind or character entered into or undertaken for the Club-Tres Vidas were made in the name of Tres Vidas. In late 1969, petitioner found it necessary to dismiss CCA and retain the services of Beck to complete construction of the Club-Tres Vidas. Accordingly, on November 21, 1969, petitioner and CCA entered into a release agreement to terminate the January 9, 1968 contract. The release agreement provided that: the agreement of January 9, 1968, is hereby terminated, and Club Corporation and R. H. Dedman each hereby waives all rights under said agreement, and each forever releases, acquits and discharges Post and all of his controlled companies and business entities (including but not limited to Tres Vidas En La Playa, S.A. de C.V., Inmobiliaria Tropo, S.A. de C.V., Inmobiliaria Helix, S.A. de C.V.,… and Helix, S.A.) from any and all claims that either now have or may have in the future for monies, fees, damages, expenses and/or property (real or personal *142 wheresoever located) arising out of or resulting from the agreement of January 9, 1968, or arising from any real estate development undertaken by Post or his controlled companies in the United States or Mexico. Pursuant to the release agreement, petitioner executed a promissory note payable to CCA in the amount of $300,000. Contemporaneous with the note's execution, petitioner paid $61,000 to CCA. In late 1972, petitioner paid an additional $100,000. Petitioners deducted the 1969 payment as a "consultation fee" on their 1969 Federal income tax return. They did not deduct the 1972 payment on their return but have raised their right to a deduction for such payment in their petition to this Court. On or about January 19, 1972, Tres Vidas paid CCA $18,507.54 for accrued interest on the promissory note described above. Similarly, in 1974, Tres Vidas paid CCA $22,772.60 for accrued interest. Tres Vidas also paid interest on the note in 1971 to CCA. Petitioners claimed an interest expense deduction on their 1974 return for the interest paid by Tres Vidas. No deductions were claimed in 1971 or 1972 but petitioners have asserted their right to a deduction for 1972 in their petition. *143 Facts Relating To Issue 9
During 1972 petitioner paid legal fees to law firms as follows: Law Firms
Amount
Jackson, Walker, Winstead, Cantwell &
Miller $ 4,005.90
Arnold & Porter
10,171.87
Kaye, Scholer, Fierman, Hays & Handler
100,000.00
Curtis, Mallet-Prevost, Colt & Mosle
12,538.03
Cahill, Gordon, Sonnett, Reindel & Ohl
2,000.00
Strasburger, Price, Kelton, Martin &
Unis
8,722.04
The legal fees paid to the law firm of Jackson, Walker, Winstead, Cantwell & Miller were for services rendered in connection with the bankruptcy proceeding of University Advertising Corporation, a corporation owned by petitioner. The invoice from the discloses the fees were for the performance of numerous services, but does not distinguish between the services performed on behalf of the petitioner and those which concern the affairs and asserts of the bankrupt corporation.
The legal fees paid to Kaye, Scholer, Fierman, Hays & Handler; Curtis, Mallet-Prevost, Colt & Mosle; Cahill, Gordon, Sonnett, Reindel & Ohl; and Strasburger, Price, Kelton, Martin & Unis, totaling $123,260.07, were for services rendered in connection with the IOS litigation. Tropo, Post Company *144 (Nevada), Post Company (Texas) and petitioner were all plaintiffs in the original law suit. The billings do not reflect a breakdown of individual charges for services rendered on behalf of each plaintiff.
The fees totaling $10,171.87 paid by petitioner to Arnold & Porter for legal services were rendered in connection with the proposed sale of condominiums and villas at the Club-Tres Vidas and memberships in Tres Vidas and the preparation of the necessary security registration documents in 1972. On July 18, 1972, petitioner paid $140,000 as a fee to Bernard Cornfeld for his assistance in negotiations leading to the settlement of the IOS litigation. Petitioners on their 1972 Federal income tax return deducted the attorneys' fees as ordinary and necessary business expenses. Similarly, the petitioners, by amendment to their petition, have claimed the right to deduct the $140,000 paid to Mr. Cornfeld. Facts Relating To Issue 10
Preston Towers Ltd. was a limited partnership in which Twin Towers, Inc. was a 98 percent general partner and Intercontinental Realty Corporation was a 2 percent limited partner. Petitioner was the sole shareholder of Intercontinental Realty Corporation. *145 Twin Towers, Inc. was a wholly owned subsidiary of Intercontinental Realty Corporation. In 1968 and 1969, the only business of Preston Towers, Ltd. was the ownership and operation of a high rise apartment building in Dallas, Texas, known as Preston Towers. From June through November 1968, petitioners made loans to Preston Towers, Ltd. in the amount of $420,000. Such loans were evidenced by promissory notes bearing 7 percent per annum interest, payable upon demand. These loans were used for mortgage payments and operating expenses. In March 1969, the Federal Housing Administration repossessed the apartment building. Such repossession caused petitioner's debt claim against Preston Towers, Ltd. to become worthless. Petitioner's loss on the loans was not compensated by insurance or otherwise. Petitioners on their 1969 Federal tax return claimed an ordinary deduction for a business bad debt. Respondent, in his statutory notice, disallowed the $420,000 as a business bad debt but allowed the amount as a nonbusiness bad debt. Facts Relating To Issue 11
In 1969, petitioner acquired six garden apartment complexes from his wholly owned subsidiary, Intercontinental Realty Corporation *146 (IRC). A year later he acquired a seventh complex from IRC. These properties were acquired by petitioner subject to a mortgage given by IRC to the First National Bank of Dallas (FNB). In 1970, petitioner sold these properties, collectively entitled "Garden Apartments," to The Company, Ltd. for $7,303,491.87 of which $78,491.87 was in cash and the balance in seven vendee notes with a face amount of $7,225,000. Petitioner reported the cost of the property as $9,227,433.21. After making an adjustment for prior claimed depreciation of $366,517.04, petitioner reported a section 1231 ordinary loss of $1,557,424.30. The vendee notes had an annual interest rate which was greater than the interest rate on the FNB mortgage. In 1972, The Company, Ltd. approached petitioner about assuming the original mortgage notes given by IRC to FNB. It requested petitioner to release the seven vendee notes given to him in 1970 as part of the purchase price. As an inducement to petitioner for releasing the seven vendee notes, The Company, Ltd. agreed to pay him the sum of $420,000. In 1972 the excess of the outstanding balances on the vendee notes given by The Company, Ltd. to petitioner over the *147 first mortgages given by IRC to FNB totaled $147,409.36. The application of the $420,000 paid by The Company, Ltd. to petitioner in assuming the FNB mortgages was as follows: (1) The difference between the two balances
owed on the original mortgages and the
vendee notes given by The Company, Ltd.
$147,409.36
(2) Sale commission
25,200.00
(3) Profit on release of the mortgage
247,390.64
Total
$420,000.00
Petitioners reported the $247,390.64 as capital gain on their 1972 Federal income tax return. Facts Relating To Issue 12
Petitioner guaranteed a loan made by Texas Bank & Trust Co. (Texas Bank) to James H. Bond (Bond). The proceeds of the indebtedness were used for the purchase of a controlling stock interest in Bank of Services & Trust in which Bond then served as chairman of the board. The loan was due on December 31, 1971. Subsequent to Bond's default, suit was filed in March 1972 against Bond on behalf of Texas Bank by John B. Stigall, Trustee. In August 1972, a judgment for the benefit of the Texas Bank in the amount of $132,180.11 was obtained against Bond. Texas Bank made no recovery with respect to such judgment against Bond. *148 In October 1972, petitioner paid $122,790.84 to John B. Stigall, Trustee, in discharge of petitioner's obligation as guarantor of the indebtedness of Bond to Texas Bank. Upon payment under the guaranty the judgment of Texas Bank was transferred to petitioner. Efforts by petitioner and his attorney to collect on the judgment, including two executions on the judgment in late 1972, were unsuccessful. In 1973, Bond mailed $1,000 to petitioner as part payment under the note. OPINION Issue 1 - Worthless Securities
Section 165(g) [4] permits a taxpayer to claim a capital loss on his investment in corporate stock in the year such stock becomes worthless. The regulations provide that a deduction for worthless stock is not allowed for extensive shrinkage in the value of the stock if it continues to have any recognizable value. Sections 1.165(a) and (f), Income Tax Regs. The loss on the stock is deductible only when the stock becomes wholly worthless. Section 1.165-5(c), Income Tax Regs. The deduction is measured by the taxpayer's adjusted basis in the stock. Section 165(b). *149 The question of whether corporate stock becomes wholly worthless in a particular year is a question of fact to be determined by reference to all the pertinent facts and circumstances. In this regard the Supreme Court in Boehm v. Commissioner,326 U.S. 287, 292-293 (1945), stated that: a determination of whether a loss was in fact sustained in a particular year cannot fairly be made by confining the trier of facts to an examination of the taxpayer's beliefs and actions. Such an issue of necessity requires a practical approach, all pertinent facts and circumstances being open to inspection and consideration regardless of their objective or subjective nature. In order for corporate stock to be worthless, the stock must have no liquidating value and there must be no reasonable hope or expectation that a continuation of business will ultimately result in some value to the holders of the stock. As articulated in Morton v. Commissioner,38 B.T.A. 1270, 1278-79 (1938), affd. 112 F.2d 320 (7th Cir. 1940); It is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless *150 and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its *151 liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.
Lack of potential value, in certain instances, may be demonstrated without the necessity of an identifiable event. There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders. In such cases the stock, obviously, has no liquidating value, and since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential value. Where both these factors are established, the occurrence in a later year of an "identifiable event" in the corporation's life, such as liquidation *152 or receivership, will not, therefore, determine the worthlessness of the stock, for already "its value had become finally extinct." [Morton v. Commissioner,38 B.T.A. 1270, 1278-79 (1938), affd. 112 F.2d 320 (7th Cir. 1940)]. Petitioner contends that his Tropo stock was worthless as of December 31, 1970. He maintains that no liquidating value existed in the Tropo stock on that date and that no reasonable hope existed of subsequently realizing any value on such stock. In this regard the petitioner maintains that the identifiable event indicating an absence of reasonable hope is an aggregate of certain difficulties the Club-Tres Vidas experienced in 1970. Alternatively, petitioner contends that this is an appropriate case for application of the exceptional circumstances test enunciated in Morton v. Commissioner,38 B.T.A. 1270 (1938).
Respondent, on the other hand, contends that petitioners have not proved a lack of liquidating value and that reasonable hope existed on December 31, 1970, that some return might occur. Respondent points to contemporaneous and subsequent activities and statements of petitioner and his agents which *153 respondent believes are inconsistent with petitioner's claim that the stock was worthless. In addition, respondent contends that no identifiable event occurred in 1970 nor do the facts and circumstances justify application of the exceptional circumstances standard. We agree with respondent for several reasons. We are not convinced that the stock had no liquidating value as of December 31, 1970. The only indication that the assets were worth less than the outstanding liabilities was the testimony of petitioner and his agents. According to petitioner, Mr. Leadbetter, and Mr. Peeples, petitioner's accountant, the total liabilities of Tropo were between $11,000,000 and $15,000,000 on December 31, 1970. Although the expenditures for land and building at the Club were approximately $20,000,000 by year end, petitioner values the realty and improvements at no more than $5,000,000 and the personalty at $1,000,000. Unfortunately for petitioner, neither authoritative balance sheets nor contemporaneous documentary evidence support his contention. Rather, the balance sheets and documentary evidence are in direct conflict with his position. In audited balance sheets prepared for and made *154 a part of a SEC registration statement, petitioner's net equity in Tropo as of August 30, 1972 was $1,561,025. In those balance sheets the property and equipment were valued at $21,539,750 less accumulated depreciation. Although the valuation is made at cost we consider it significant that none of the accounting notes attached to the balance sheet disclose the great disparity between fair market value and cost that petitioner says existed or the fact that six months earlier the petitioner had filed an amended return writing off his $12,000,000 investment as worthless. Moreover, the notes to the balance sheet further indicate that the assets listed at book value were substantially undervalued. Finally, in the period contemporaneous and subsequent to December 31, 1970, petitioner and Leadbetter made numerous statements concerning the value of the Tropo properties in their efforts to promote Club operations, obtain long-time financing, sell villas and lots and in subsequent attempts to sell partial ownership of Tropo. For example, in 1973 negotiations with Diamond Head, petitioner valued the Tropo subsidiaries' land at $50,000,000. On another occasion, in a letter to the Mexican *155 membership, petitioner cited with approval certain independently prepared appraisals of Tropo properties ranging from $52,000,000 to $84,000,000. These statements are just a few that express characterization of the facts contrary to the position asserted here. In his efforts to prove that the value of the land and buildings were worth little more than the value of unimproved land, petitioner cites the collapse of the IOS deal, the lack of any prospective purchaser for Tropo properties in 1970 and the decision by IOS and Financiera Bancomer not to foreclose on the Tropo properties in 1970. The first argument is without merit. The failure of the IOS deal does not, in our opinion, demonstrate that no liquidating value existed in Tropo. First, petitioner admitted that the IOS deal fell through because of IOS's internal financial difficulties. Second, the IOS deal was not an agreement to purchase the Club properties but rather a financing arrangement whereby petitioner's investment in Tropo and other short-term obligations of Tropo would be converted into long term debt and monies would be available to develop additional Tropo properties. In 1970, petitioner did not try and was *156 not interested in selling his interest in Tropo. He was also not interested in losing any management voice in the operation of the then existing Club facilities. Petitioner's aim in securing the financing arrangement with IOS was to continue the potentially lucrative development of the surrounding properties owned by Tropo and to create the necessary population density so that the Club's facilities would operate profitably. Petitioner's contentions that the decision by IOS and Financiera Bancomer not to foreclose against Tropo demonstrates no liquidating value are also unpersuasive. With respect to the Financiera Bancomer loan, the evidence clearly indicates that the bank was cooperative in converting its short-term loan into long-term financing. With construction continuing in 1970 and the Club open for less than one year, there was no reason why Financiera Bancomer, holding a senior mortgage, would desire to foreclose. According to Leadbetter's testimony, IOS would have taken the Tropo stock held as collateral and exercised control over Tropo if Financiera Bancomer, at a meeting of creditors in December 1970, had not told IOS that such a move might precipitate foreclosure *157 and that in a foreclosure IOS would realize nothing. Whether or not representatives of Financiera Bancomer actually made such a statement, the decision by IOS not to exercise control over Tropo does not lend any appreciable weight to the view that there was a lack of liquidating value. First, IOS was in the business of finance, not resort management. Second, IOS held a personal guaranty of petitioner on which more liquid assets were readily available in the United States. Third, if IOS had asserted control and if Financiera Bancomer did foreclose, the property would be tied up in litigation for a long time. Most importantly, however, is the fact that foreclosure did not occur. As a result, any inferences which may arise from IOS inaction are merely inferences and here the inference advanced by petitioner finds less support in the underlying facts than the contrary inference. Petitioner's argument that no one would buy Tropo or any of its properties in 1970 as demonstrative of no liquidating value is also without merit. We note that petitioner did not actively attempt to sell any part of his interest in Tropo to outside control until late 1972 in negotiations with Diamond *158 Head. Most of his financing arrangements were coupled with his complete retention of control over Tropo and the Club. Likewise, no serious efforts were made to sell individual pieces of Tropo property for condominium development until late 1972. At that time the asking prices for such lots were far in excess of the value he presently attributes to the land. Thus, we are left with a situation in which petitioner's claims that the stock had no liquidating value as of December 31, 1970, are refuted by his efforts over the five years subsequent to that date to finance, expand and sell part of his interest and certain properties. Moreover, during these efforts petitioner cited independent appraisals which stated that the buildings, land and equipment were worth far in excess of liabilities. It is possible, albeit unlikely, that if IOS and Financiera Bancomer had foreclosed in 1970, in a distress sale of the assets, the amount realized may have been less than the amount of the outstanding debt. But such a sale or foreclosure did not occur. It is likewise not enough to excuse the statements of value or use of appraisals as mere showmanship or bargaining banter. Such appraisals provided *159 the backbone of numerous finance and purchase arrangements in which petitioner sought to remove the immediacy of the IOS obligation from the Club and himself and by which the lucrative return from the sale of condominiums, hotels, and home sites were to be effected. Accordingly, we conclude that petitioners have failed to demonstrate that the stock had no liquidating value on December 31, 1970. Assuming arguendo that petitioner had demonstrated a lack of liquidating value, we also conclude that on December 31, 1970 and through 1972, the last tax year in issue) there was not a lack of reasonable hope of return on petitioner's investment. He has failed to demonstrate either an identifiable event or exceptional circumstances which would justify our finding an absence of potential value. Ordinarily, an absence of potential value is predicated on an identifiable event, such as liquidation, dissolution, foreclosure or bankruptcy, which occurs during the year of alleged worthlessness. None of these events occurred in 1970. On December 31, 1970, the Club-Tres Vidas was open for business and no plans were present to shut down the Club and liquidate it along with the extensive real *160 properties held by the Tropo subsidiaries. Petitioner asserts that the failure of IOS to provide the agreed upon financing is akin to an identifiable event. We disagree. At the point in time of the collapse of the IOS agreement the Club had been open for less than one year. The agreement was not one in which petitioner was attempting to sell his interest but was a refinancing arrangement for the Club and a means by which the anticipated development of Tropo properties for condominium and hotel construction would begin. We do not accept petitioner's premise that the failure of one deal automatically meant that no other source of money would or could be found subsequently. Petitioner contends that certain other factors indicate an absence of potential value on December 31, 1970. First, he maintains that the Club-Tres Vidas and other realty owned by Tropo's subsidiaries were very isolated from Acapulco and resulted in an inability to attract the necessary capital for complete development or sufficient usage of the Club's facilities. However, the evidence shows that the Tropo properties were in close proximity to the airport, that downtown Acapulco was a thirty minute ride from *161 the Club, that the Club had five miles of beachfront and that the original theme of the Club was to be rest, relaxation and athletic recreation, not proximity to a hotel strip. No documentary evidence contemporaneous with the 1970 year indicates that petitioner considered location to be a liability. In fact, if location was a liability, then from the moment petitioner purchased the property through Tropo, his stock was worthless. Such an argument under the circumstances herein presented is unconvincing. Petitioner also contends that pronouncements of Mexico's President Echeveria, in which foreign control and majority ownership of Mexican business were criticized, dashed any reasonable hope of return. However, Echeveria did not take office until 1971 and his anti-foreign control and ownership program was instituted in 1973. Once again, the documentary evidence is replete with statements from petitioner, his agents, and independent marketing studies which indicate that tourism development potential in Mexico was great. Moreover, even with the desire of Echeveria to reduce the percentage of foreign ownership and control of certain businesses in Mexico, petitioner has continued *162 to date to have an active interest in maintaining some investment in the Tropo operations. Petitioner maintains that the Club's operating losses of $3,000,000 in its first year is also proof of an absence of potential value. We do not agree. No immediate operating gain from initial Club operations was expected or realized. Rather, the real source of potential return on petitioner's stock investment rested in the anticipated appreciation in the value of land to be used for condominium and hotel development. Petitioner believed that once condominium and hotel development occurred, sufficient usage of the Club facilities would be generated to restrict losses or to generate operating gains. Petitioner believed that the Club would serve as a catalyst for development of condominiums, hotels, and adjoining property owned by the Tropo subsidiaries. In 1970, with limited facilities at the Club and with construction of 104 of the 300 rooms incomplete, it is no wonder that early operations yielded substantial loss. Such losses were magnified by extravagant construction costs, operating waste, the physical layout of the Club, and the high fixed costs of maintaining the grounds and servicing *163 the guests. Neverthless, with greater utilization of the Club grounds and anticipated development of the real property, petitioner thought such losses would be reduced. We note that by 1974 operating losses for tax purposes on the completed club grounds were 75 percent less than in the opening year of operation. Petitioner argues that the failure of IOS to foreclose on the Tropo properties in late 1970 demonstrates that his Tropo stock had no potential value. According to petitioner's advisor (Leadbetter), IOS did not take control of the Tropo enterprise or sue Tropo because in a forced liquidation at that time the Tropo properties would result in an insufficient amount to repay IOS. Such an argument is unpersuasive. If no reasonable hope existed, then why did IOS not take what it could get. from a Tropo liquidation instead of permitting petitioner's continued ownership of the properties? The decision by IOS not to take control of Tropo pursuant to the escrow agreement or to sue Tropo can easily be read to support a finding that reasonable hope existed. In fact, petitioner's own actions strongly contradict his present view on IOS's failure to foreclose or sue Tropo. For *164 example, in July 1970, petitioner obtained a temporary restraining order to prevent an IOS assertion of ownership over the escrowed stock of Tropo.
In our view these circumstances, separately or collectively, do not constitute an event which permanently foreclose a reasonable hope of future return. Although petitioner may have been threatened with a loss of his enterprise because of his escrow agreement with IOS, such a loss did not occur. Moreover, the Financiera Bancomer loan was extended and repayment of the IOS loan by Tropo or petitioner under his guaranty was postponed by a settlement in 1972 until 1975. In effect, petitioner is asserting that early financial difficulties attendant to IOS's failure to provide financing might have resulted in a distress sale of Tropo properties which might have left nothing for IOS and nothing for petitioner. Such a distress sale of the corporate assets did not occur, however, and the Club continued to operate, albeit with infusions of petitioner's money, until 1975. The following factors, we think, are indicative that the stock had value on December 31, 1970. First, petitioner did not close the Club to cut operating losses generated *165 by use of the Club facilities. The Club remained open through 1975 with a continuing and substantial effort to sell memberships and to collect annual dues. A number of celebrity golf tournaments were held in 1972 and 1973. The annual occupancy rate at the Club increased each year and the Club continued each year to reduce its operating losses. Second, construction continued at the Club after 1970. An additional 104 rooms were completed in 1972, and Tropo purchased 61 acres of land to provide its membership with access to a fresh water lake. Thereafter, construction was commenced on a canal to connect the lake to the Pacific Ocean. Third, numerous efforts were made to find financing for the development of the adjoining properties owned by Tropo's subsidiaries and to remove the immediacy of the Financiera Bancomer and IOS obligations. We note that petitioner was not willing to sell or give up any substantial control of the Tropo properties until 1972 when negotiations with Diamond Head initially proceeded on the basis of a stock exchange. As late as 1974 petitioner's advisor Leadbetter was informing Loeb-Rhoades that with the Club's dramatically improved financial condition, *166 individuals who had previously wished to buy out petitioner were ready to deal with petitioner on a more agreeable deal-by-deal basis. Such a statement by petitioner's advisor does not comport with petitioner's claim that the stock was worthless in 1970. In this regard petitioner asks us to view the failure of each and every one of the subsequent negotiations for financing as indicative that the stock was worthless on December 31, 1970. Yet such subsequent developments, in our view, do not support the petitioner's contention that no reasonable hope existed in 1970. His initial desire was to finance his projects with outside capital but maintain control through singular ownership of Tropo. None of the financing arrangements appears to have failed for lack of faith in the Club-Tres Vidas concept. The IOS agreement collapsed for internal financial reasons. Braniff's refusal to supply working capital was based on its inability to secure approval from its principal creditors. During the course of negotiations Diamond Head ran into financial difficulties and the Mendosa agreement ended when the ejidos invaded the properties in 1975. Another factor which influences our decision *167 is the statements by petitioner and his agents with respect to the value of Tropo and Tres Vidas as expressed in various documents, news articles, and in the course of his negotiations with potential financiers. Petitioner argues that these statements are bargain banter and based on certain assumptions of development, governmental cooperation and tourism, assumptions which never became realities. Nevertheless, the negotiations with Diamond Head, the Mendosa group and others were conducted in a serious manner and we reject petitioner's hindsight view (which is always 20 - 20) that his asking price was merely a bluff. Moreover, potentialities are always "ifs". That is the rationale of the requirement under section 165(g) that an absence of reasonable hope be demonstrated. We think it is more reasonable to conclude on this record that in 1970 reasonable hope did exist that petitioner would realize a return on his Tropo investment. However, with the closing of the Club in 1975 due to the ejidos invasion, the likelihood of return at the present time has been greatly reduced, if not totally dashed. But notwithstanding the difficult period in the early operations of Tropo and Tres *168 Vidas, we cannot say that an absence of reasonable hope of return existed on December 31, 1970. Finally, we note that petitioner, after the alleged worthlessness in 1970, advanced an additional $14,000,000 to Tropo and Tres Vidas between 1971 and 1975. Such willingness to contribute large amounts to finish construction and operate the Club does not comport, under these circumstances, with a claim of worthlessness. Petitioner was an astute businessman who clearly knew when to abandon ship. However, he argues that he had to continue such contributions because if Tropo folded, so would his entire domestic financial empire. This, petitioner maintains, would result from the immediate call by creditors on his guaranties, bonds and other contingent liabilities on obligations of his domestic corporations. We fail to see such a pervasive dependency between petitioner's stateside activities and the financial condition of Tropo. The financial condition of petitioner's domestic corporations and the ability of such corporate creditors to call on petitioner to honor a guaranty or bond is dependent upon the performance of those corporations, and not upon the ability of Tropo to pay its *169 obligations. No proof other than vague statements by petitioner that such liabilities would immediately fall due has been offered. Even if a relationship could be shown between Tropo's failure and petitioner's stateside obligations, the average stateside contingencies (non-Tropo) were approximately $2,300,000 in 1971 and $3,000,000 in 1972. Thus, allegedly to protect against assertion of stateside contingencies, petitioner argues that he contributed $6,000,000 in 1971 and $4,000,000 in 1972 to Tropo. He also contends that he had to continue to make the Tropo advances until he reduced his other contingent liabilities. Yet the schedule of such stateside contingent liabilities over the 1971 to 1975 period shows that petitioner's contingent liabilities did not decrease. Petitioner's argument that personal bankruptcy would have resulted had the stateside contingencies been asserted upon the collapse of Tropo appears to have little merit. First, no nexus between the stateside corporate performances and petitioner's role as guarantor and bondsman and his obligations with respect to Tropo has been shown. Moreover, the financial conditions of these stateside corporations have not *170 been shown. As on December 31, 1970, the only obligations that petitioner guaranteed with respect to Tropo were the IOS loan and a $2,000,000 loan from the First National Bank of Dallas. Yet petitioner's own balance sheet for that date shows a net worth of approximately $29,000,000. Even if we assign a zero value to petitioner's investment in Tropo listed in his balance sheets, his remaining net worth is $17,000,000. By June 30, 1971, petitioner's net worth, including his contributions to Tropo, was $45,287,015.13. Exclusive of his Tropo advances his net worth was approximately $25,000,000. At the same time petitioner realized $22,000,000 in cash from the sale of certain LTV debentures. In light of these figures, his assertions that he lacked the means to absorb the potential guaranty obligations of Tropo are not supported by the evidence. Assuming arguendo that petitioner was in a tight financial position on December 31, 1970, his subsequent actions in 1971 and 1972, when he could have closed the Club without risking insolvency, negate his present contention that the contributions were made merely to stave off collapse of his financial empire. Petitioner further contends *171 that his advances to Tropo ceased in 1975 since he had reduced his contingent liabilities to a point that he could handle them. Once again, contemporaneous documentary evidence and petitioner's own accounting schedules disprove this contention. As of December 31, 1974, non-Tropo contingent liabilities were $3,049,647. On June 30, 1972, petitioner's non-Tropo contingent liabilities equalled $2,938,000. On June 30, 1971, non-Tropo contingent liabilities equalled $2,400,000. In fact, over the four-year period to 1975 the average non-tropo contingencies increased annually. Moreover, petitioner in a letter to the Mexican director for tourism in October 1975 urged the director to have the ejidos removed so that the Club could reopen in time for the winter season. Nothing in any of the contemporaneous writings suggests a concern with stateside contingent liabilities as the basis for postponing a Club shutdown. Petitioner also argues that his contributions to Tropo were not for any reasonable hope of eventual return but for his loyalty to the membership. If that was the case, it is difficult to understand why the petitioner continued to enlist additional members after his worthlessness *172 claim for 1970. Moreover, the amount advanced to Tropo from 1969 to 1975 is a minimum of 10 times the total membership fees collected. If petitioner knew the investment was worthless and wished to repay the membership, he could have done so at great savings to himself. Accordingly, we do not think that this was the real purpose behind petitioner's advances. In our opinion there is insufficient evidence to support the view that the Tropo stock was worthless on December 31, 1970. With less than one year of operation, and substantial construction in progress, petitioner's actions indicated that he believed the complex would serve to stimulate land and tourist development on adjoining Tropo properties. Although the Club did run into difficult times in its efforts to refinance the IOS short-term obligation into a long-term obligation, none of the evidence presented supports petitioner's contentions that the stock was worthless. Petitioner first determined that Tropo was worthless in late 1971 and filed an amended 1970 tax return on January 4, 1972 to that effect. We note that in 1971 petitioner had a $17,000,000 capital gain from the sale of certain LTV debentures. On this record *173 the petitioner has failed to show the necessary indicia of worthlessness. Subsequent events now indicate that the complex and property development plans were perhaps permanently dashed in 1975 with the invasion of the ejidos on the Club property, the ensuing shutdown of operations, and the deterioration of the golf courses and clubhouse. Nevertheless, petitioner still hopes to reopen the Club under some form of Mexican government guaranty to his lenders, who are apparently willing to refinance the still outstanding Financiera Bancomer loan and provide monies for repair. Although such present actions may be only the actions of a man who does not quit, we are unable to conclude that petitioner's actions in the post 1970 period were rash, unreasonable, or indicative of anything but a contrary view to what has been expressed at trial. Most importantly, no identifiable event or exceptional circumstances have been demonstrated to have occurred in 1970. Likewise, no identifiable event nor exceptional circumstances occurred in 1971 and 1972 which would justify our finding the stock became worthless in those years. Accordingly, we hold that petitioner's investment in Tropo was not worthless *174 on December 31, 1970. Issues 2 Through 4 - Treatment Of Certain Advances To Tropo And Tres Vidas
Petitioner con tends that the advances made by him to Tropo and Tres Vidas during the years 1971 to 1974 are deductible as section 162 or section 212 expenditures necessary to protect his stateside financial interests from collapse. Such a collapse, petitioner maintains, would have resulted from the immediate assertion of guaranties, bonds and other contingent liabilities by creditors of his stateside corporations against him. In this regard petitioner asserts that the advances cannot be considered to be debt since he had no reasonable hope of repayment at the time the advances were made. Alternatively, he contends that if we do classify the advances as debt, such debt was worthless at the end of each year in which the advance was made. Respondent, on the other hand, contends that such advances should be treated as capital contributions and not as debt. Moreover, respondent argues that petitioner is not entitled to any immediate deduction for his advances to Tropo and Tres Vidas. We agree with respondent that the advances during 1971 to 1974 should be treated as capital *175 contributions to petitioner's investment in Tropo. Petitioner has failed to demonstrate that any relationship existed between his guarantor obligations with respect to certain domestic corporations and his advances to Tropo and Tres Vidas. No persuasive evidence has been introduced which would convince us that the collapse of Tropo and Tres Vidas would result in creditors of his domestic corporations, asserting all debts against such corporations. There is no evidence of any relationship between Tropo and the stateside corporations or the financial position of such corporations. Likewise, we fail to perceive how the failure of Tropo can provide the basis for domestic corporation creditors to declare various debts immediately due or certain construction bonds to be in default. It would appear to us that such defaults must be based on the particular corporation's credit position, not that of Tropo or Tres Vidas. Any contingent obligations that petitioner had with respect to such corporations, such as guaranties on loans or performance bonds would not be due unless those corporations failed to pay or perform properly. Moreover, an examination of the schedule of contingent liabilities *176 prepared by petitioner's accountant does not lend support to his argument. According to this schedule, petitioner advanced upwards of $6,000,000 to Tropo and Tres Vidas in 1971 to protect against assertion of stateside contingent liabilities of approximately $2,000,000 on June 30, 1971. Likewise, in 1972 petitioner advanced approximately $4,000,000 to protect stateside contingent liabilities of $3,000,000. His argument that he had to supply Tropo and Tres Vidas with money until his stateside contingent obligations were reduced to a manageable level in 1975 is refuted by his own schedule which demonstrates a rising amount of contingent liabilities (guaranties, etc.) over the period between 1971 and 1974. Accordingly, we conclude that petitioner is not entitled to deduct the advances made from 1971 to 1974 as either section 162 or 212 expenditures. The question of whether the advances made by petitioner to Tropo and Tres Vidas created debt or equity depends on the economic substance of the transactions between them and not the form utilized by petitioner to record the advances on his or the corporations' books and records. Gregory v. Helvering, 293 U.S. 465 (1935). *177 Thus, the mere fact that the advances were in the form of unsecured and non-interest bearing demand notes is not determinative of the issue. Instead, the following factors are often utilized by the courts in determining whether the economic substance of the advance is a contribution to capital rather than debt: (1) the financial viability of the corporation; (2) the manner in which the corporate debt is created; (3) the financial source from which corporate repayment is to be anticipated; (4) the identity of interest between shareholder and creditor; and (5) separate payment of interest and principal or complete absence of such payment. Alterman Foods, Inc. v. United States, 505 F.2d 873, 876 (5th Cir. 1974); Tyler v. Tomlinson, 414 F.2d 844, 847-848 (5th Cir. 1969); Montclair, Inc. v. Commissioner, 318 F.2d 38, 40 (5th Cir. 1963). We think that the advances constitute capital contributions to Tropo. First, the demand notes specify no interest rate and no interest or principal has even been repaid. Second, the advances were made primarily for operating and construction expenditures and were made as needed. Third, all of the *178 advances were made by the petitioner at a time when he was the controlling shareholder of Tropo. Finally, the advances were made by petitioner at a time when the Club was operating at a large deficit. In this connection it was unlikely that petitioner expected repayment from Club operations until such time as the necessary expansion and development of surrounding Tropo properties was commenced. Hence, we conclude that the advances made during this period constitute capital contributions. Issue 5 - Deductibility Of Certain Interest Payments
Section 163(3) allows a deduction for "all interest paid or accured within the taxable year on indebtedness." However, it is well established that the "statutory provision allowing deduction for interest on indebtedness means interest on an obligation of the taxpayer claiming it; payments made on obligations of others do not meet the statutory requirement." Sheppard v. Commissioner, 37 B.T.A. 279, 281-282 (1938). There is no question that in 1971 the petitioner paid to or through the First National Bank of Dallas the amount of $145,245.27 in interest on loans owed by Tropo and $4,333.32 on loans owed by Tres Vidas. Before *179 petitioner is entitled to claim a deduction for these payments, however, he must demonstrate that he was directly liable on the obligation. Guardian Investment Corporation v. Phinney, 253 F.2d 326 (5th Cir. 1958). Although petitioner has testified that he was a joint obligor on such loans, no documentary evidence has been introduced which would support a finding that petitioner was directly or indirectly liable on the loans. Moreover, petitioner's books and records indicate that Tropo and Tres Vidas were solely responsible for the loans. Petitioner may have believed that he was morally responsible to pay the interest on the loans but such a belief does not elevate the payments to the status of an allowable deduction. We think that such payments more properly represent additional capital contributions by petitioner to Tropo in 1971. We likewise think that petitioner is not entitled to a deduction under section 163(a) for the $603,493.34 paid by him to Financiera Bancomer in 1971 for interest on a Tropo loan. He was not contractually obligated to pay either interest or principal on the five million dollar loan from Financiera Bancomer which was secured by a *180 senior mortgage on all of the real properties of the Tropo subsidiaries. His only connection to the loan was through his ownership of the stock of Tropo.
Petitioner contends that he is entitled to a section 162 or 212 deduction for the interest paid to Financiera Bancomer. He posits that, in the absence of his payment, Financiera Bancomer would have foreclosed on Tropo, forcing the Club to close and precipitating the financial insolvency of his stateside corporation interests. In accordance with our earlier conclusions with respect to this argument, we think it lacks merit. No evidence indicates any nexus between Tropo and the financial solvency of petitioner's other business interests. Accordingly, we conclude that petitioner is not entitled to a section 162 or 212 deduction for the interest payment made to Financiera Bancomer on behalf of Tropo. The payment of interest by petitioner is an additional capital contribution to Tropo in 1971. Issue 6 - Deductibility of Payments To IOS In Settlement Of Litigation
In 1972 petitioner paid $1,000,000 to IOS as part of a settlement in which the original Tropo obligation of $5,000,000 to IOS was replaced by an obligation of petitioner *181 to purchase a certain tract of Mexican land from IOS in 1975 for $5,984,000. The Tropo obligation bore an annual interest rate of 13 1/2 percent and was guaranteed by petitioner. The new obligation was evidenced by a non-interest bearing promissory note executed by petitioner enforcible only if IOS desired to sell the tract of land to him in 1975. The tract of land in question was transferred in trust for a nominal consideration to IOS by petitioner as part of the settlement agreement. Petitioner contends that the $1,000,000 payment represented prepaid interest on the $5,984,000 obligation and not past due interest on the original Tropo loan. Alternatively, petitioner maintains that the payment is deductible pursuant to section 162, 163, 165 or 212. To the contrary, respondent contends that the $1,000,000 payment was for accrued interest on the original Tropo note. Such payment, respondent maintains, is not deductible by petitioner since he was not directly liable on the note. Moreover, respondent asserts that the payment of such interest is a capital contribution by petitioner to Tropo. Petitioner argues that this expenditure should be allowed as either a section 162 *182 or 212 deduction since he was trying to protect his other financial interests from collapse. As in the previous issues where this claim has been rejected, we find that this argument has little merit. Petitioner has also not demonstrated to our satisfaction that the $1,000,000 represented a prepaid interest amount on the $5,984,000 promissory note. The settlement agreement did not define the nature or purpose of the payment and the testimony of petitioner and his agents was vague, inconsistent and uncertain as to the purpose of the payment. Moreover, we note that no interest had been paid by Tropo on the original $5,000,000 note. In the absence of any definitive evidence to carry petitioner's burden of proof, we think that the $1,000,000 payment more properly is a settlement of the accrued interest on the original Tropo note. Generally, when a guarantor is forced to answer and fulfill his obligation of guaranty, the law raises a debt in favor of the guarantor against the principal debtor. Spring City Co. v. Commissioner,292 U.S. 182 (1934); Aftergood v. Commissioner,21 T.C. 60 (1953). Accordingly, an obligation in favor of petitioner and *183 against Tropo arose after payment of the $1,000,000. In the absence of a finding that such debt is worthless, petitioner is not entitled to a bad debt deduction. In accordance with our earlier conclusion with respect to the issue of worthless securities, we think the debt was not worthless on December 31, 1972. See Evans v. Commissioner,557 F.2d 1095 (5th Cir. 1977). Finally, petitioner claims that he is entitled to deduct the $1,000,000 payment under section 165(c)(2). In support of his argument, petitioner cites Shea v. Commissioner,36 T.C. 577 (1961), affd. 327 F.2d 1002 (5th Cir. 1964). That case is inapposite. In Shea, the taxpayer was a guarantor of certain corporate bonds who paid $26,815 to be released from his guaranty obligations. No claims against the corporate obligors had been made. The issue to be decided in that case was whether the guaranty obligation constituted a capital asset such that the payment was to be treated as a loss from the sale or exchange of a capital assert. Here petitioner was not seeking a release of guarantor liability but was performing as a guarantor by his payment of accrued interest *184 on a Tropo obligation. As we have earlier indicated, at the time of his performance as guarantor, petitioner stepped into the shoes of the creditor and a debt in favor of petitioner was created. See Stamos v. Commissioner,22 T.C. 885, 890 (1954). Absent a finding of worthlessness, no deduction for petitioner's performance under the guaranty is appropriate. Accordingly, we conclude that petitioner is not entitled to deduct the payment under section 165(c)(2). Issue 7 - Deductibility Of Consultant Fees Paid By Petitioner
In 1968 petitioner engaged CCA to provide certain management and consultation services in connection with the construction and operation of Club-Tres Vidas. On or about November 21, 1969, the parties entered into a release agreement which terminated the earlier contract. In connection with the execution of the release agreement, petitioner paid CCA $61,000 in cash and gave it a $300,000 note. In 1972, petitioner made a $100,000 payment on the note to CCA. Petitioner contends that the payments made by him to CCA are deductible under section 162, 165 or 212. He maintains that the original contract was never assumed explicitly or implicitly *185 by Tres Vidas and that the release was executed in petitioner's personal capacity. Respondent, on the other hand, contends that the obligation to pay the amounts required under the release agreement are properly attributable to the corporate entity and are deductible expenditures of the corporate entity, not of petitioner. We agree with respondent. Although it is true that the original contract was entered into by petitioner prior to the organization of Tres Vidas, the subsequent use by Tres Vidas of the services of the management and consultation firm implicitly connotes its acceptance and adoption of petitioner's responsibilities under the contract. See Ward v. Commissioner,20 T.C. 332 (1953), affd. 224 F.2d 547 (9th Cir. 1955). We note that during the period of CCA's service at Tres Vidas payments for construction and supervision were paid by Tres Vidas with petitioner's capital contributions. Thus, petitioner's argument that CCA was serving him is without merit. In fact, CCA was serving Tres Vidas. Petitioner's signature on the release agreement does not create, in our view, any right to deduct the payments here in issue. The fact of execution *186 in an apparently nonrepresentative capacity does not prevent us from examining to whom the expenditure was properly attributable. It is a well settled rule that shareholders are not entitled to pay and claim a deduction for corporate expenditures. Rink v. Commissioner,51 T.C. 746, 752 (1969); Koree v. Commissioner,40 T.C. 961, 965-966 (1963); Kahn v. Commissioner,26 T.C. 273 (1956); Ihrig v. Commissioner,26 T.C. 73 (1956). The determination of whether a certain expenditure is a corporate expenditure necessitates and examination of the relationship of the expenditure to corporate operations. In the instant case the services of CCA were performed in conjunction with the construction of a resort club on properties owned by Tres Vidas.The facilities were owned by Tres Vidas and the future operation of the Club was to be conducted in corporate form through Tres Vidas. When dissatisfaction with the manner in which CCA was performing at the Club-Tres Vidas arose, it was necessary that a replacement organization be found to continue construction on the corporate properties. In short, the decision to fire CCA and replace *187 it with Beck was necessarily a corporate one. Thus, we reject the suggestion that the mere execution of a release by petitioner converts a corporate expenditure into a deductible business expense for petitioner. In our opinion this is a distinction without a difference. Whether petitioner merely paid a corporate obligation or entered into a contract to pay a corporate obligation, the fact remains that the obligation is essentially a corporate one. Thus, the 1969 and 1972 payments are not deductible as business expenses by petitioner but are properly attributed to Tres Vidas. Petitioner is entitled, however, to add such expenditures to the capital cost of his stock investment in Tropo. Issue 8 - Deductibility Of Certain Interest Expenditures
In view of our opinion with respect to the proper attribution of principal payments under the CCA release agreement, it follows that the payment of interest by Tres Vidas to CCA in 1972 and 1974 is not deductible by petitioners on their Federal income tax returns for those years. Issue 9 - Deductibility Of Legal Fees
We must determine the deductibility of certain legal fees paid by petitioner in 1972 as well as the deductibility *188 of a payment of Mr. Cornfeld for his services in settling the IOS litigation. Petitioner paid $4,005.90 to Jackson, Walker, Winstead, Cantwell and Miller for services rendered in connection with the bankruptcy proceeding of University Advertising Corporation, a corporation owned by petitioner. Petitioner has failed to establish that this expenditure was proximately related to his interest as a shareholders in the bankruptcy proceeding. The mere fact that the bill was addressed to a shareholder does not prove deductibility. In the absence of proof, we must disallow the deduction. Rule 142, Tax Court Rules of Practice and Procedure.
Petitioner paid $10,717.87 to Arnold and Porter for their services in connection with the proposed sale of condominiums and villas at the Club-Tres Vidas and the preparation of the necessary SEC registration statement for such sale. These expenditures are clearly the expenditures of Tres Vidas. Accordingly, petitioners are not entitled to deduct such amount on their 1972 Federal income tax return. Petitioner also contends that the certain legal fees paid to four law firms in 1972 for their services in the course of various lawsuits and negotiations *189 involving the Tropo loan from IOS are deductible under section 162(a) or 212(2). Alternatively, petitioner argues that section 165(c)(2) is applicable. We disagree. Petitioner's argument that he is entitled to either a section 162(a) or 212(2) deduction is premised on his belief that such expenditures were necessary to protect his other trades or businesses or investments. We have earlier held that such protection was not the reason for other advances and expenditures (and in which similar claims were grounded) and we similarly find no basis to permit deduction under those provisions here. Petitioner cites Rushing v. Commissioner,58 T.C. 996 (1972) and Imel v. Commissioner,61 T.C. 318 (1973), in support of his argument that section 165(c)(2) is applicable to the instant case. We do not think, however, that these cases provide support for petitioner's contentions. In Imel and Rushing, the taxpayers had guaranteed certain obligations of wholly owned corporations. When the corporations had defaulted on the obligations, the taxpayers incurred certain legal expenses in their efforts to settle their liability under the guaranty. In *190 each case, however, the Court found that the corporation was insolvent, that the stock was worthless and that any amounts contemporaneously paid by the taxpayer on the guaranty were worthless debts. Here, by contrast, we have affirmatively found the petitioner's stock in Tropo was not worthless during the years in issue, that the subrogated debt created by petitioner's $1,000,000 payment on behalf of Tropo was not worthless and that the authoritative balance sheets of Tropo indicate that the corporation was not insolvent on September 30, 1972, there months after the settlement. It would be anomalous to suggest that petitioner can deduct the attorneys' fees associated with the lawsuit involving payment of his obligations under the guaranty while at the same time be denied a contemporaneous deduction for the amounts paid under the guaranty. In effect, petitioner made a de facto loan to Tropo in the amount of the attorneys' fees, a loan which we think was not worthless in 1972. See Stamos v. Commissioner,22 T.C. 885, 891 (1954). Finally, petitioner's reliance on Shea v. Commissioner,36 T.C. 577 (1961), affd. 327 F.2d 1002 (5th Cir. 1964), *191 is also misplaced. In Shea, the taxpayer sought to be released from any potential liability under his guaranty of a corporate debtor. No default by the corporation obligor had previously occurred and no possible right of reimbursement from the corporation existed. Accordingly, the expenditure at the time was final and in the Court's view constituted a loss on a transaction entered into for profit under section 165(c)(2). Here the payment of such legal fees created an obligation on the part of Tropo to petitioner, an obligation under which reimbursement could eventually be sought. In view of our findings with respect to the legal fees, we think similar treatment is mandated for the payment made by petitioner to Mr. Cornfeld for his role in settling the IOS litigation. Accordingly, we hold that the petitioner may not deduct either the legal expenses associated with the IOS litigation or the settlement fees paid to Mr. Cornfeld under section 162(a), 165 or 212(2). Issue 10 - Characterization Of Bad Debt
Preston Towers, Ltd. was a limited partnership composed of Twin Towers, Inc., a 98 percent general partner, and Intercontinental Realty Corp. (Intercontinental) *192 a 2 percent limited partner. Petitioner owned all the stock of Intercontinental. Twin Towers, Inc. was a wholly owned subsidiary of Intercontinental. In 1968 petitioner loaned $420,000 to Preston Towers, Ltd. for use in the operation and financing of its one significant asset, an apartment building. These loans were evidenced by notes bearing 7 percent interest and were payable on demand. In March 1969, the Federal Housing Administration repossessed the building thereby making petitioner's claim against Preston Towers, Ltd. worthless. Respondent agrees that petitioners are entitled to a worthless debt deduction on their 1969 Federal income tax return with respect to these loans to Preston Tower, Ltd. He contends, however, that such debt should be characterized as a nonbusiness bad debt. Petitioner, on the other hand, claims that he was in the general trade or business of financing corporations and lending money so that the loss was a business loss. With respect to a debt other than a nonbusiness debt, an individual is allowed an ordinary loss deduction for the total or partial worthlessness of such debt. Section 166(a). The term nonbusiness debt is defined in section 166(d)(2) *193 to be a debt other than (1) a debt created or acquired in connection with the taxpayer's trade or business or (2) a debt the loss from the worthlessness of which is incurred in such trade or business. An individual claiming a business bad debt loss must establish that the debt or worthlessness arose in the taxpayer's trade or business. The term trade or business, when used in relation to losses or expenses of an individual, means the pursuit or occupation to which he contributes a major or substantial part of his time for the purpose of a livelihood or profit. In Whipple v. Commissioner,373 U.S. 193 (1963), the Supreme Court expressly disapproved of the argument that one who is actively engaged in financing and serving his own corporations, even though numerous, for the purpose of creating future income through those enterprises is in a trade or business, and stated that "[absent] substantial additional evidence, furnishing management and other services to corporations for a reward no different than that flowing to an investor in those corporations is not a trade or business under § 23(k)(4)." The Court narrowed considerably the type of activity which would *194 constitute a trade or business. After pointing out that full-time service by a taxpayer to many corporations was no more effective in creating a trade or business than was full-time service to a single corporation, the Supreme Court said at pages 202-203: To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, see Ballantine, Corporations (rev. ed. 1946), 102, or for a profit on their sale, see Giblin v. Commissioner [56-1 USTC P9103], 227 F.2d 692 * * * (C.A. 5th Cir.), but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise * * *. On the basis of this record we hold that petitioner's participation in various enterprises over the years did not amount to a trade or business within the meaning of Whipple.
The evidence also does not support petitioner's claim that he was in the trade or business of lending money. On all of his tax returns for the years 1969 to 1975 the petitioner reported his occupation *195 as investments. An examination of the returns for such years indicates that petitioner did not derive substantial income from the lending of money to various businesses. For example, in 1969, petitioner reported $4,407,338.73 as interest income, of which all but $10,000 was from his investment holdings of LTV debentures. These debentures had been received in the sale of his stock interest in Great American Corporation a year earlier. Moreover, in most of the situations in which petitioner "loaned" money to his wholly owned corporations, the circumstances surrounding the loans indicate that such advances were in the nature of capital contributions. Return on his advances to these undertakings were usually by sale of his investment. Accordingly, since petitioner has failed to prove that he was in the trade or business of lending money, we hold that he is entitled only to deduct the Preston Towers debt as a nonbusiness bad debt in 1969. Issue 11 - Characterization of Certain Mortgage Payments
In 1969, petitioner purchased seven properties from IRC subject to a mortgage given by IRC to FNB. Thereafter, in 1970, petitioner sold the properties to The Company, Ltd. and took *196 back seven vendee notes as part of the purchase prices. The vendee notes had an annual interest rate which was greater than the interest rate on the FNB mortgage. Petitioner agreed to pay the IRC mortgage from the payments received on The Company, Ltd. vendee notes. In 1972, The Company, Ltd. approached petitioner about assuming the original mortgage given by IRC to FNB. In such an assumption the seven vendee notes given by The Company, Ltd. to petitioner in 1970 would be transferred back to its maker. Moreover, The Company, Ltd. would pay petitioner $420,000, of which $147,409.36 represented the excess balance on the vendee notes over the FNB mortgages and $25,000 represented a "sale commission" to petitioner. The characterization of the remaining $247,390.64 is in controversy here. Petitioner contends that the transfer of the seven vendee notes back to The Company, Ltd. constitutes a sale or exchange of the notes such that the balance of the $420,000 should be treated as capital gain. Respondent, on the other hand, argues that the physical transfer of the notes constitutes either a release or extinguishment of the obligation and that no sale or exchange within the meaning *197 of those terms has occurred. In this respect respondent contends that the $247,390.64 represents nothing more than an advance receipt of some of the interest income petitioner would have earned if he had held the seven vendee notes to maturity. We agree with respondent. Ordinarily, a sale or exchange of property cannot be said to result where one party transfers property that upon the transfer no longer exists. Fairbanks v. United States,306 U.S. 436 (1939); Leh. v. Commissioner,260 F.2d 489 (9th Cir. 1958); Osenbach v. Commissioner,198 F.2d 235 (4th Cir. 1952); Bingham v. Commissioner,105 F.2d 971 (2d Cir. 1939). In the present situation petitioner "transferred" his rights in The Company's Ltd. notes back to The Company for its promise to pay the FNB mortgage and $420,000. Upon The Company, Ltd. receiving its own notes that obligation was extinguished. As the Court stated in Bingham v. Commissioner,supra at 972: What may have been property in the hands of the holder of the notes simply vanished when the surrender took place and the maker received them. He then had, at most, only *198 his own obligations to pay himself. Any theoretical concept of a sale of the notes to the maker in return for what he gave up to get them back must yield before the hard fact that he received nothing which was property in his hands but had merely succeeded in extinguishing his liabilities by the amounts which were due on the notes. There was, therefore, no sale of the notes to him in the ordinary meaning of the word and no exchange of assets for assets since the notes could not, as assets, survive the transaction. Our view that such a retirement of the partnership's debt is not the equivalent of sale or exchange is further supported by the existence of section 1232. It provides an exception to the general rule that amounts paid to a holder of a note upon retirement or redemption constitute ordinary income or loss in situations where certain corporate indebtedness is retired. In such situations within the exception, the retirement will be deemed the equivalent of a sale or exchange and capital treatment will be available. Here the obligor is a partnership, not a corporation, and cannot avail itself of section 1232. See Fairbanks v. United States,306 U.S. 436 (1939). *199 Accordingly, we conclude that the $247,390.64 payment should be treated as ordinary income. Issue 12 - Guarantor Loss
Petitioner guaranteed a loan made by Texas Bank to Bond. The proceeds of the loan were used for the purchase of a controlling stock interest in the corporation in which Bond served as Chairman of the Board. Upon Bond's default in 1972, Texas Bank proceeded to judgment against Bond on the loan but was unsuccessful in recovering any part of the judgment. In October 1972, petitioner paid $122,709.84 in discharge of his guaranty and the original judgment was transferred to him. His subsequent efforts to collect on the judgment in 1972 were unsuccessful. Generally, when a guarantor is forced to answer and fulfill his obligation of guaranty, the law raises a debt in favor of the guarantor against the principal debtor. Spring City Co. v. Commissioner,292 U.S. 182 (1934). If that debt is worthless, it is generally deductible as a nonbusiness bad debt under section 166(d) provided the guarantor is not in the trade or business. However, prior to 1976, section 166(f) [5] provided that section 166(d) mandating capital loss treatment would be *200 inapplicable if a noncorporate guarantor's payment satisfied a noncorporate debt the proceeds of which were used in the obligor's trade or business and at the time of payment the obligor's debt to the original creditor was worthless. If the requirements of section 166(f) are met, petitioner is entitled to an ordinary deduction. Respondent challenges petitioner's right to deduct as worthless the payment of the guaranty under section 166(f). It appears that respondent's challenge is predicted on his belief that the debt owed petitioner by Bond was not worthless in 1972 since Bond subsequently paid petitioner $1,000 in 1973. We disagree. Section 166(f) does not require that the issue of worthlessness relate to the debt between the guarantor and the obligor. It requires that the debt between the obligor and obligee be worthless on the date the guarantor discharges his obligation. It is clear from the record that the bank was unable to collect on the judgment it secured against Bond. Subsequent attempts by petitioner in 1972 *201 also were of no avail. Although Bond did unexpectedly pay $1,000 in 1973, that fact standing alone does not negate the reasonable conclusion of worthlessness in 1972. Since respondent has not challenged petitioner's assertion that the proceeds of the loan were used in the debtor's trade and business, we hold that petitioner is entitled to an ordinary deduction under section 166(f). To reflect the concessions and our conclusions on the disputed issues, Decisions will be entered under Rule 155.
Footnotes
1. The following issues have been conceded by the petitioners: (1) Nondeductibility of 1969 advances to Morgan Maxfield and University Advertising Company; (2) Nondeductibility of certain rental expenses in 1969 and 1970; (3) Nondeductibility of certain professional fees in 1971; (4) Worthlessness of University Advertising Corporation stock in 1969; (5) Exclusion of certain capital gains reported in 1972 on receipt of $50,669.16 with respect to University Advertising Corporation stock. (6) Exclusion of $9,331.34 from income in 1972; (7) Nondeductibility of certain consultation fees in 1972; (8) Nondeductibility of certain traveling expenses, postage, and farm expenses in 1972. Determination of net operating loss carry-backs and carry-forwards for the years in issue can be computed under Rule 155, Tax Court Rules of Practice and Procedure↩, in accordance with the factual and legal resolutions of the issues before the Court.
2. On January 4, 1972, petitioners filed an amended income tax return for the calendar year 1970. On April 13, 1977, petitioners filed amended income tax returns for 1970, 1971, 1972, and 1973.↩
3. On July 8, 1971, an amended complaint was filed in which Tropo was removed as a party plaintiff. Such removal was predicated on an allegation that Tropo's rights in the proceeding had been assigned to the Post Co.(Nevada) in mid-1970.↩
4. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the tax years in issue.↩
5. This provision was repealed by section 605(a) of the Tax Reform Act of 1976, Pub. L. 94-455, effective for guarantees made after December 31, 1975.↩